## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**ALLAN TEASEL**
*individually and on behalf of a Class of Involuntary Patients at State Mental Health Hospitals Operated by the State of Michigan and the Department of Health and Human Services*

Case No.:17-10987
Hon: Thomas L. Ludington

Magistrate Judge Patricia T. Morris

Plaintiffs,

v.

**STATE OF MICHIGAN**, and its **DEPARTMENT OF HEALTH AND HUMAN SERVICES**.

Defendants.

---

**MILLER COHEN, P.L.C.**
Bruce A. Miller (P17746)
Richard G. Mack, Jr. (P58657)
Adam C. Graham (P79361)
*Attorneys for Plaintiffs*
600 W. Lafayette Blvd., 4th Floor
Detroit, MI  48226
(313) 964-4454
brucemiller@millercohen.com
richardmack@millercohen.com
agraham@millercohen.com

---

## COMPLAINT FOR INJUNCTIVE RELIEF

1.      The Plaintiffs, by Bruce A. Miller, Richard G. Mack, Jr., and Adam C. Graham, MILLER COHEN, P.L.C., say for their complaint, as follows:

## INTRODUCTION

2.     The health and safety of persons who are involuntary patients at State mental health institutions is a matter of Constitutional significance. Patients are entitled to be safe in their confinement. The legal standard, set forth in *Youngberg v. Romeo*, 457 U.S. 307 (1982) states unequivocally:

> "In the past, this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause…And that right is not extinguished by lawful confinement, even for penal purposes…It is cruel and unusual punishment to hold convicted criminal in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.

*Id.* at 315. This case posits that excessive mandatory overtime for Resident Care Aides (RCAs) has created a clear and present danger to the safety and health of the patients.

Patients in State psychiatric hospitals are, for the most part, involuntarily committed pursuant to state law. The criteria for admission is set forth in MCL§ 330.1401 and provides that involuntary admission shall occur for persons with mental illness who: "intentionally or unintentionally seriously physically injure themselves or another individual; who [are] unable to attend to their basic physical needs; a person whose judgement is so impaired that the person cannot comprehend the nature of the illness and therefore may be likely to suffer significant physical harm to themselves or others; and a person who by reason of their inability to

comprehend the nature of their illness does not participate voluntarily for treatment or is non-compliant for treatment." *Id.*

The Defendants operate five (5) mental health institutions in the state. Each of these have a patient population that reside in the hospital involuntarily either as a result of voluntary commitment or as a result of court orders. Some are felons unable, due to mental disease, to assist counsel in the defense of criminal matters, others are persons found not-guilty by reason of insanity, and still others are committed in accordance with Michigan statutes. Caro Center is a psychiatric hospital in Caro, Michigan with approximately 193 beds and 611 admissions.

According to Plaintiff Allan Teasel (see Affidavit, *Exhibit A*), who is a patient at Caro Center, the patients are often aggressive and require constant monitoring. These aggressive patients are monitored on an "Aggression Scale", which keeps track of their behavior. They may be required to take additional medications and/or have their stay extended if they continue to go up on the scale. This Plaintiff has observed increasing violence among patients that correlates with increased mandatory overtime for RCAs.

Renae Goyette (Affidavit, *Exhibit B*) resigned her employment as a RCA at Caro Center due to excessive overtime effecting her health and well-being. She says that during a typical two-week period she was mandated to work an additional 8-

hour shift as many as 7 to 8 times. She describes the effects of sleep deprivation on the safety of patients participating in one-on-one observations:

> It is absolutely critical that the assigned RCA on the one-to-one watch remain alert, with her eyes trained on the patient at all time. The life and the safety of the patient, or even the others in the room, could depend on the RCA noticing dangerous behavior of the patient, and reacting immediately. The one-to-one watch involves the RCA sitting in the room with the patient, and doing nothing but watching the patient. For RCAs, who are being repeatedly mandated to work 16 hour days, for multiple days in a row, it become very difficult to stay awake while watching a dangerous patient. This creates a tremendous hazard.

(Id.) Her affidavit describing the effect of this inhuman work schedule on her is worth reading in full.

Where patient populations residing in locked wards have assaultive and murderous criminal records and suffer psychotic conditions, including severe depression, a wakeful and alert staff is required at all time. That staff is now virtually non-existent and patients have suffered significant injury to their health and well-being as a result.

The correlation of fatigue occasioned by excessive overtime mandated by health facilities has resulted in an almost national consensus that mandatory overtime creates a health hazard affecting the safety of patients. The consensus has been recognized in sixteen (16) states that have adopted statutes prohibiting or regulating mandatory overtime because it is recognized as a health hazard to patients and to the nurses who work it. The same considerations apply equally to RCAs. The

4

states having statutes are: Arkansas, California, Connecticut, Illinois, Maryland, Minnesota, Missouri, New Jersey, New Hampshire, New York, Oregon, Pennsylvania, Rhode Island, Texas, Washington, and West Virginia. (*Exhibit C – report of the Robert Goods Johnson Foundation*) Many other states are considering similar legislation.

The amount of mandatory overtime is considerable among RCAs in Caro Center. It has remained at this unsustainable level for years..

Even the State of Michigan itself agrees that mandatory overtime has an adverse effect on patient health. The Michigan Department of Community Health established a Task Force on Nursing Practices, which issued its final report and recommendations in April 2012. The relevant section of that report is attached hereto as *Exhibit D*.

With specific reference to fatigue impairment of nursing personnel, the Report states on page 53:

[F]atigue impairment (mental, physical, and emotional), sleep deprivation and compromised decision making/problem resolution

- Nurses caring for many high-acuity patients or working repeated long shifts may get inadequate rest and become fatigued. Fatigued nurses make more errors, and fail to catch the errors of others, compromising the quality and safety of patient care.

- Nurses assessing their own human factors may fail to recognize the need to implement fatigue management strategies, engage in self-care efforts, or consider the physical, mental and emotional

variable that impact their ability to be vigilant, make critical decisions, and provide safe patient care.

- Extended work hours, mandated work shifts, and shifts that start during normal sleep hours (e.g., 3 a.m.) have been associated with healthcare errors, as well as patient and nurse morbidity and mortality.

(Id.)  The Task Force recommended that facilities: "support a workplace culture that eliminates extended work periods, i.e., mandatory overtime or excessive voluntary overtime, greater-than-9-hour shifts, double shifts, and 72-96 hour work weeks." (Id.)

The findings of this report are easily applicable to RCAs. The State of Michigan Civil Service Commission establishes the job description for RCAs. (*Exhibit E*) Persons working under this classification "provide direct care services to resident…with physical or mental disabilities in facilities providing 24-hour care." (Id.)  They are required to conduct "appropriate interpersonal communications" with patients, make "visual observation of area to ensure resident…whereabouts and safety, and monitors activities", "control[s] aggressive or disruptive behavior", and "monitors residents…in seclusion who are likely to be physically abusive to others or self-abusive." (Id.) Their skill requirements include the "ability to observe, evaluate, and record conditions, reactions and changes in the physical and mental conditions or residents or prisoners", the "ability to maintain appropriate attitude and conduct necessary to the welfare of residents or prisoners",

and the "ability to handle the physical demands of the work including…aggressive behavior management practices." (Id.) The job "require[s] [RCAs] to handle the physical demands of the work including lifting and restraining residents or prisoners." (Id.)

Sadly, rather than implementing the findings of its task force, the Department calls for discipline for RCAs who do not accept mandatory overtime assignments.

A tabulation of the total hours worked at Caro Center from January through August of 2015 establishes that the RCAs significantly exceed the recommendation of the Task Force:

### Tabulation of Total Hours Worked In Excess of Nine Hours Per Day – 2015

| Month | Days in Excess of 9 Hours | Range from – to |
|-------|---------------------------|-----------------|
| January | 15 | 10.20 – 16.98 |
| February | 24 | 10.10 – 15.32 |
| March | 30 | 11.39 – 15.58 |
| April | 29 | 10.68 – 13.60 |
| May | 31 | 10.36 – 14.26 |
| June | 30 | 11.35 - 16.90 |

(Affidavit of Renae Judd with charts attached, *Exhibit F*)

### Tabulation of Total Hours Worked In Excess of Nine Hours Per Day – 2016-2017

| Month | Days in Excess of 9 Hours | Range from – to |
|-------|---------------------------|-----------------|
| January | 26 | 10.08 – 13.28 |
| February | 20 | 10.01 – 13.52 |
| March | 28 | 9.72 – 12.95 |
| April | 21 | 9.92-12.87 |
| May | 26 | 9.78 – 12.57 |

| June | 27 | 9.43 - 12.32 |
| July | 31 | 9.01-13.52 |
| August | 19 | 9.13-10.96 |
| September | 16 | 9.00-10.70 |
| October | 25 | 9.02-12.24 |
| November | 20 | 9.01-11.24 |
| December | 30 | 9.57-13.62 |
| January | 25 | 9.11-11.36 |
| February | 19 | 9.09-10.32 |

(Affidavit charts attached, *Exhibit G*)

Renae Goyette (*Exhibit B*) reports:

One example of how this excessive mandation impacted me physically is following my injury on May 29, 2015.I was working on a unit referred to as the "safe haven" unit, which is where patients who are prone to injure themselves are placed. I was assigned to "one-to-one" duty. This means that I was responsible for watching no one other than one patient during my entire shift. On a one-to-one, the RCA must be within an arm's length of the patient at all times, and must watch the patient at all times in order to prevent the patient from hurting herself or others. The patient I watched that day was prone to hurt herself, and when someone intervened, she became combative and would try to hurt others. Patients like these are watched constantly for 24 hours of the day, by the assigned staff.

On this day, the patient tried to cover her head with her blanket. We cannot allow this to happen since the patient could be trying to hurt herself under the blanket. This was specifically in the doctor's order for this patient. I tried to uncover the patient's head and hands, so they were visible to me. The patient became combative and attacked me with her hands and fists. The patient pulled my hair and clothes, while punching at me with her fists. We ended up on the floor as the patient tried to take me down. I called for help and someone finally came to pull the patient off of me. The patient pulled my hair also.

(Id.)

It is absolutely critical that the assigned RCA on the one-on-one watch remain alert, with her eyes trained on the patient at all times. The life and safety of the patient, or even the others in the room, could depend on the RCA noticing dangerous behavior of the patient and reacting immediately. The one-to-one watch involves the RCA sitting in the room with the patient and doing nothing but watching the patient. For RCAs who are being repeatedly mandated to work 16-hour days, for multiple days in a row, it becomes very difficult to stay awake while watching a dangerous patient. This creates a tremendous hazard.

A recent report of the Michigan Occupational Safety and Health Administration (MIOSHA) of October 18, 2016, (*Exhibit H*) found that deteriorating conditions at just one hospital, Caro Center, resulted in the following patient inflicted injuries on staff:

> Fractures of the skull and leg
> Detached retina
> Torn rotator cuffs
> Torn biceps tendon
> Torn labrum (cartilage holds shoulder together)
> Concussions
> Ruptured discs
> Exposure to blood and other potentially infectious materials
> Hair torn out
> Soft tissue injuries.

(Id. at 6)

This report did not directly address the question of mandatory overtime for RCAs. But a specific finding concerning sitting arrangements for staff required that

Caro Center: "ensure that employees can observe an individual resident *and remain alert* without being injured as a result of inappropriate seating." (Id. at 14) Although this report focused on the safety of employees, the opposite side of this safety coin is just as applicable, namely, that such recommendations and changes to existing conditions in the hospital protect the patients as well. In every violent incident, one must conclude that a patient may have also suffered injury or death.

Dr. Timothy Roehrs is the Director of Research at the Sleep Disorders and Research Center at Henry Ford Health System and a professor in the Wayne State University School of Medicine Department of Psychiatry and Behavioral Neurosciences. (*Exhibit I, Opinion and Curriculum Vitae*) He has reviewed the relevant documents underlying this litigation and has opined:

> The Most direct and immediate consequence of insufficient sleep is an enhanced drive to sleep – excessive sleepiness. This leads to the "nodding-off" and the inattention of the RCAs reported by the patients. And a one-on-one monitory situation makes a sleepy individual most vulnerable to "nodding off". Boring monotonous situations unmask even the mildest level of underlying sleepiness.
>
> Laboratory assessments of the behavioral/functional consequences of insufficient sleep have revealed slowed reaction times, memory and mental errors, and errors of judgment. These impairments have been directly related to hours of sleep on a single night and the hours of lost sleep accumulated over multiple nights. Both laboratory and on-the-road assessment of automobile driving have shown increased "nodding-off" episodes and driving lane deviations, which increase the likelihood of automobile crashes.
>
> Finally, motivation and social interactions is reduced as a result of insufficient sleep. While these aspects of function have not been as

10

extensively studied in the laboratory, patients with excessive sleepiness and their family members report such impairment in function.

Of greatest importance, the impact of mandated overtime shifts on RCAs then has a direct impact on the health and safety of the patients. RCA in-attention and slowed responding places patients at greater risk for patient-on-patient aggression, self-injurious behavior, and higher ratings of aggressive tendency leading to their overmedication. Increased irritability and reduced motivation in RCAs then reduces the potential for social interactions among patients and between patients and RCAs. Taken together, the daily life of the patient is more impoverished, their environment is more dangerous, and their opportunity for education and self-improvement is diminished.

To conclude, it is my expert opinion that requiring RCAs to work mandatory overtime shifts as is currently being scheduled poses a direct danger to the RCA's own health and most importantly to the health and safety of patients.

(Id.)

The problem of mandatory overtime, which has become an issue for legislatures across the country, has also crept into the public domain. In May 2014, Business Wire, a publication of Berkshire Hathaway, reported: "exhausted by numerous forced overtime shifts, several dozen Metropolitan State Hospital Psychiatric Technicians still somehow found the strength to chant, march and picket today against the facility's unsafe staffing and union-contract violations." (*Exhibit J*) The December 11, 2014, edition of the Cape News reported that "bitter cold did not deter a group of more than 20 nurses from holding signs that read "Exhausted nurses-unsafe care," "End mandatory overtime"... (*Exhibit K*) There are literally scores of stories like this posted in newspapers from coast-to-coast.

In Michigan, the Lansing State Journal ran a featured investigative piece dated October 8, 2015. (*Exhibit L*) The story told the all too familiar story of Fred Spes, a 49-year-old Nurse Manager at Caro Center:

> Every day the Unionville man is up by 4 a.m. to get out the door in time for his half hour drive to a 6 a.m. shift. If he's mandated-as happened to him a handful of times over the last three months-he may not leave work until 10:30 p.m. and won't get home until 11. He's lucky to fall asleep by midnight and then it's back up at 4 to start all over again.

(Id.) "On these days, 'you're tired. You're dealing with the mentally ill, who can be aggressive at any moment,'" he said. (Id.) "You're just not functioning as well." (Id.)

RCAs at some of these hospitals are covered by collective bargaining agreements that place limitations on mandatory overtime. But, upon information and belief, the Department ignores these contractual limitations and although they may have remedies under their contracts, patients do not have these remedies and should not be held hostage to procedures they cannot control and which may be inadequate for their needs.

The Michigan Department of Community Health along with the State of Michigan are no strangers to the intervention of the federal court in the administration of their health care policies. See Consent Decree in *United States of America v. State of Michigan, et al.*, Civil Action 86CB73321DT (Fed. District Court Judge George Woods):

"In *Youngberg v. Romeo*, 457 U.S. 307…we extended this analysis beyond the Eighth Amendment setting, holding that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with such services as are necessary to ensure their 'reasonable safety' from themselves and others…As we explained: 'If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed - who may not be punished at all - in unsafe conditions…' *De Shaney v. Winnebago County Department of Social Services*, 489 U.S. 18"

(Id.)    Similarly, Plaintiffs bring this suit seeking injunctive relief to prevent Defendants from imposing mandatory overtime on RCAs that put at risk the safety of the patients involuntarily committed.

## PARTIES

3.     Plaintiff Allan Teasel is involuntarily committed at Caro Center, a state operated psychiatric hospital, because of alleged criminal activity and the need for mental treatment.

4.     Defendants State of Michigan and the Department of Health and Human Services operate five mental health hospitals: Caro Center, Center for Forensic Psychiatry, Hawthorn Center, Kalamazoo Psychiatric Hospital, and Walter Reuther Psychiatric Hospital. Plaintiffs bring this claim against Defendants for their actions at Caro Center, although it is clear similar practices have been adopted at the other facilities as well.

## JURISDICTION AND VENUE

13

5.      Jurisdiction is proper in that a federal question is involved. The claim arises under the Due Process Clause of the United State Constitution, U.S. Const. amend XIV.

6.      This Court has proper venue pursuant to 28 U.S.C.§ 1391(b).

## CLASS ACTION ALLEGATIONS

7.      This action is brought by Plaintiffs as a class action on their own behalf and on behalf of all others similarly situated, under the provisions of Rules 23 of the Federal Rules of Civil Procedure, for injunctive relief, to end the practice of mandatory overtime and for costs and attorney fees.

8.      The class so represented by the Plaintiffs in the action, and of which Plaintiffs are themselves members, consists of inmates/patients at Caro Center who are involuntarily committed and who are adversely impacted in their health and safety by a policy and practice of the Defendants that requires RCAs to work mandatory hours of overtime that affect the acuity, awareness, alertness, attention and demeanor of the RCAs to the extent that they are less able to provide for the health and safety of the members of the class.

9.      The exact number of the members of this class are not known but it is believed that it exceeds six hundred (600) patients. The class is so numerous that joinder of individual members in this action is impractical.

10.    There are common questions of law and fact involved in the action that affect the rights of each member of the class and the relief sought in common to the entire class, namely:

a.    The refusal of the Defendants to implement the report of its Task Force on Nursing practices and limit the hours worked by RCAs so that excessive overtime does not create a health and safety hazard for patients; and

b.    Whether the failure of the Defendants to limit overtime under the facts and circumstances violates the patients' constitutional right to safety and healthy conditions; and

c.    Whether the overtime practices of the Defendants create a generic health and safety problem that would be generally applicable to all patients in this class; and

d.    Whether injunctive relief is both lawful and practicable under the fact of this case.

11.    The claims of the Plaintiffs, who are representative of the class, are typical of the claims of the class, in that the claims of all members of the class, including the Plaintiffs, depends on a showing of the acts of omissions of Defendants giving rises to the right of the Plaintiffs to the relief sought. There is no conflict as

between the Plaintiffs and other members of the class with respect to this action, or with respect to the claims for relief set forth in this complaint.

12. The named Plaintiffs are representative of the class, and are able to, and will fairly and adequately protect the interests of the class. The attorneys for Plaintiffs are experienced and capable in litigation in the field of litigation concerning issues of health and safety and class actions.

13. This action is properly maintained as a class action inasmuch as Defendants have acted or refused to act, as more specifically alleged below, on grounds that are applicable to the class, and have a reason of such conduct, made appropriate final injunctive relief or corresponding declarative relief with respect to the entire class, as sought in this action.

## CONDITIONS OF PLAINTIFFS

14. Plaintiff Teasel is involuntarily committed to Caro Center Psychiatric Hospital because of allegations of criminal activity coupled with his need for psychiatric treatment. In his hospital setting, he is surrounded by patients who are viciously assaultive including rapists, child molesters, and persons suffering psychotic depressions that pose risks of injuring themselves, other patients, and staff and patients suffering from polydipsia, which also requires close monitoring to keep patients away from sources of water. In Plaintiff Teasel's hospital, there have been riots, patient-on-patient and patient-on-staff assaults, suicides and attempts at

suicide, self-maiming and attempts at self-maiming, intoxication from excessive ingestion of water, and attempts to escape and actual escapes from the premises.

15. Many of the patients do not receive visitors, are very solitary, do not engage with one another or the staff, and suffer from severe loneliness. They need one-on-one time with RCAs to heal. Yet, due to excessive overtime, they are not receiving the attention that they need.

## STAFF STRUCTURE

16. The patients are primarily served by two (2) staff positions: the Nurse Manager and the RCAs. The Nurse Manager supervises the RCAs who are the primary care employees who are supposed to provide direct care and have direct contact with the patients.

17. RCAs provide direct care to the patients on a 24-hour basis; they provide appropriate interpersonal communications between themselves and the patients; are required to maintain visual observation of patient areas to ensure resident whereabouts; they are required to maintain visual observation of patients to maintain patient safety; they are required to control and prevent aggressive and disruptive behavior; they monitor patients in seclusion to prevent them from engaging in self-harm; and they must have the physical ability to handle the physical demands of the work including aggressive behavior management practices.

## ORGANIZATION OF STATE HOSPITALS

18.     The Michigan Department of Community Health and the Human Services Department have been merged pursuant to an Executive Order of Governor Snyder. The new department is the Michigan Department of Health and Human Services. This department runs the five state-owned and operated psychiatric hospitals: Caro Center, Center for Forensic Psychiatry, Hawthorn Center, Kalamazoo Psychiatric Hospital, and Walter Reuther Psychiatric Hospital.

19.     The patients in these hospitals are, except in the case of Hawthorn Center and the Center for Forensic Study, committed to the facility involuntarily pursuant to MCL§ 330.1401 because they are mentally ill and either:  intentionally or unintentionally seriously physically injure themselves or others; unable to attend to their basic physical needs, whose judgment is so impaired that they cannot comprehend the nature of the illness they suffer and therefore are likely to suffer significant physical harm to themselves or others; or unable to comprehend the nature of their illness and are not willing to participate in voluntary treatment or are non-compliant with their treatment.

20.     All these hospitals, including Caro Center, are subject to identical labor policies, including mandatory overtime, as herein described.

## TASK FORCE ON NURSING PRACTICES

21.    The Michigan Department of Community Health which is now the Defendant Michigan Department of Health and Human Services, established a task force on nursing practices that reviewed the nursing practices generally within the state. The Task Force was particularly focused on mandatory overtime and its impact on patient care, health, and safety. The recommendations of the Task Force, given the specific character of the state's psychiatric hospitals, applies to them in spades. Among the findings and recommendations, the Defendant found that:

   a.    Nurses caring for many high-acuity patients or working repeated long shifts may get inadequate rest and become fatigued. Fatigued nurses make more errors, and fail to catch the errors of others, compromising the quality and safety of patient care.

   b.    Nurses assessing their own human factors may fail to recognize the need to implement fatigue management strategies, engage in self-care efforts, or consider the physical, mental, and emotional variable that impact their ability to be vigilant, make critical decision, and provide safe patient care.

   c.    Extended work hours, mandated work shifts, and shifts that start during normal sleep hour (e.g., 3 a.m.) have been associated with healthcare errors, as well as patient and nurse morbidity and mortality.

(*Exhibit D*) The report of the Study Group recommended: A workplace culture that eliminates extended work periods, i.e., mandatory overtime or excessive voluntary overtime, greater-than-9-hour shifts. (Id.)

22.    The collective bargaining representative for the RCAs at Caro Center has grieved over the practice of mandatory overtime to no avail. The Defendants

continue to mandate overtime regardless of the objections or the recommendations of their own study committee. The rights of the patients are not subordinate to the rights of the RCAs pursuant to their collective bargaining agreements in that the claims of the Plaintiffs are of a constitutional character.

23.     On information and belief there is evidence that patients on one-on-one surveillance injured themselves and others due to the failure of staff suffering from excessive fatigue, that same also being true for patients suffering from polydipsia, and that patients with assaultive proclivities have acted out to the injury of themselves and others due to the effects of a fatigued staff unable to properly perform.

24.     The mandatory overtime practices of the Defendants pose a clear and present danger to the health and safety of patients in Defendants' hospitals.

**COUNT I**
**<u>VIOLATION OF SUBSTANTIVE DUE PROCESS</u>**

29.     Plaintiffs incorporate herein by reference each of the preceding paragraphs.

30.     The Due Process Clause of the U.S. Constitution guarantees that an individual will not be deprived of life, liberty, or property without due process of law. U.S. CONST. amend V. Furthermore, under the Fourteenth Amendment, no one may be "deprived of life, liberty or property without due process of law" nor be denied equal protection of the laws. U.S. CONST. amend. XIV, § 1.

20

31.    Similarly, the Michigan Constitution ensures:

No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

Mich Const (1963), art I, §17.

32.    These constitutional provisions protect citizens from the deprivation of their fundamental rights—those rights specifically identified in the Constitution or principles of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental and therefore implicit in the concept of ordered liberty. *See e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

33.    In *Youngberg v. Romeo*, the U.S. Supreme Court unequivocally held:

"In the past, this Court has noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause…And that right is not extinguished by lawful confinement, even for penal purposes…It is cruel and unusual punishment to hold convicted criminal in unsafe conditions, it must be unconstitutional to confine the involuntarily committed-who may not be punished at all-in unsafe conditions.

34  U.S. 307, 315 (1982).

34.    Consequently, Plaintiffs have a fundamental right to safe conditions that they cannot be deprived of by state action without violating substantive due process.

35.     As noted above, mandatory overtime has led to an overly worked RCAs whose exhaustion threatens the lives of those involuntarily committed.

36.     The acts and omissions of Defendants alleged in this complaint, deprive persons confined in Defendants' hospitals of rights, privileges or immunities secured or protected by the Constitution of the United Sates and such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges or immunities by persons confined to Defendants' hospitals.

## PRAYER FOR RELIEF

37.     Unless restrained by this Court, Defendants will continue to engage in the conduct and practices set forth in this complaint that deprive persons confined in Defendants' hospitals of the rights, privileges or immunities secured or protected by the Constitution of the United Sates, and cause irreparable harm.

WHEREFORE, the Plaintiffs pray that this Court certify the class alleged herein and that thereafter upon a hearing on the merits enter an order permanently enjoining the Defendants, their officers, agents, employees, subordinates, successors in office, and all those acting in concert or participation from mandating overtime for RCAs. Plaintiffs pray that this Court grant such other and further equitable relief as it may deem just and proper, including the award of attorney fees and costs to Plaintiffs' counsel.

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By: /s/Bruce A. Miller
       Bruce A. Miller (P17746)
       Richard G. Mack, Jr. (P58657)
       Adam C. Graham (P79361)
       *Attorneys for Plaintiffs*
       600 W. Lafayette Blvd., 4th Floor
       Detroit, MI  48226
       (313) 964-4454

Dated: April 13, 2017

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**ALLAN TEASEL**
*individually and on behalf of a Class of*
*Involuntary Patients at State Mental*
*Health Hospitals Operated by the*
Morris
*State of Michigan and the Department*
*of Health and Human Services*

Case No.: 17-10987
Hon. Thomas L. Ludington

Magistrate Judge Patrice T.

Plaintiffs,

v.

**STATE OF MICHIGAN**, and its
**DEPARTMENT OF HEALTH**
**AND HUMAN SERVICES**.

Defendants.

---

**MILLER COHEN, P.L.C.**
Bruce A. Miller (P17746)
Richard G. Mack, Jr. (P58657)
Adam C. Graham (P79361)
*Attorneys for Plaintiffs*
600 W. Lafayette Blvd., 4th Floor
Detroit, MI  48226
(313) 964-4454
brucemiller@millercohen.com
richardmack@millercohen.com
agraham@millercohen.com

---
/

# CERTIFICATE OF SERVICE

I hereby certify that on *March 28, 2017*, I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

**MILLER COHEN, P.L.C.**

By: /s/Bruce A. Miller
   Bruce A. Miller (P17746)
   Richard G. Mack, Jr. (P58657)
   Adam C. Graham (P79361)
   *Attorneys for Plaintiffs*
   600 W. Lafayette Blvd., 4th Fl.
   Detroit, MI  48226
   (313) 964-4454

Dated:  April 13, 2017