UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ALLAN TEASEL,

                Plaintiff,                Case No. 17-cv-10987

v.                                                Honorable Thomas L. Ludington

ROSE LASKOWSKI,

                Defendant.

_____/

**OPINION AND ORDER DENYING MOTION TO DISMISS AND DIRECTING
SUPPLEMENTAL INFORMATION AT UPCOMING HEARING**

On March 28, 2017, Plaintiff Allan Teasel, a patient at a mental health institution initiated this case on his behalf and on behalf of other similarly situated patients. His complaint alleges that the State of Michigan and the Department of Health and Human Services have violated his substantive due process rights by forcing his caregivers to work excessive overtime. Compl., ECF No. 1. On July 17, 2017, Teasel filed an amended complaint which names Rose Laskowski, the director of the mental health institution housing Teasel, as the only Defendant. Am. Compl., ECF No. 30. Several days after filing the amended complaint, Teasel filed a motion for a preliminary injunction. ECF No. 32. On August 25, 2017, Lawskowski filed a motion to dismiss the suit for lack of standing. ECF No. 43. A hearing on the two motions was held on November 7, 2017. That hearing will be continued on January 22, 2018. However, no further oral argument on Defendants' motion to dismiss is necessary. For the reasons that follow, the motion to dismiss will be denied.

**I.**

Plaintiff Allan Teasel is a patient at the Caro Center, a state-run psychiatric hospital in Caro, Michigan. Am. Compl. at 3. The Caro Center is one of five state-run mental health institutions in Michigan, and each of those institutions "have a patient population that reside in the

hospital involuntarily either as a result of voluntary commitment or as a result of court orders." *Id.* Teasel was involuntarily committed at the Caro Center after being accused of criminal activity and found in need of psychiatric treatment. *Id.* at 14. Defendant Rose Laskowski is sued in her official capacity as the Director of the Caro Center ("the Director"). *Id.*

In the amended complaint, Teasel contends that the Director's chronic usage of mandatory overtime has compromised patient safety by producing a "sleep-deprived staff." *Id.* at 4. As Teasel alleges: "Where patient populations residing in locked wards have assaultive and murderous criminal records and suffer psychotic conditions, including severe depression, a wakeful and alert staff is required at all time. That staff is now virtually non-existent and patients have suffered significant injury to their health and well-being as a result." *Id.*

## A.

Patients at the Caro Center are cared for by two types of staff: Resident Care Aids ("RCAs"), "who are the primary care employees who are supposed to provide direct care and have direct contact with the patients," and the Nurse Manager, who "supervises the RCAs." *Id.* at 18. RCAs care for patients on a 24-hour basis. *Id.* Their duties include the following:

> [P]rovide appropriate interpersonal communications between themselves and the patients, . . . maintain visual observation of patient areas to ensure resident whereabouts, maintain visual observation of patients to maintain patient safety, control and prevent aggressive and disruptive behavior monitor patients in seclusion to prevent them from engaging in self-harm, and must have the physical ability to handle the physical demands of the work including aggressive behavior management practices.

*Id.*

Teasel acknowledges that the collective bargaining agreement between the Caro Center and the RCAs anticipates mandatory overtime, despite attempts by the RCAs to end that practice. *Id.* at 20–21. Notwithstanding the CBA, Teasel asserts that "[t]he rights of the patients are not

subordinate to the rights of the RCAs pursuant to their collective bargaining agreements in that the claims of the Plaintiffs are of a constitutional character." *Id.* at 21.

Teasel alleges that "Defendant Laskowski, while acting under the color of state law and with duties performed during the scope of her employment, has required that RCAs work mandatory overtime over extended periods of time at pain of being disciplined for refusing." *Id.* at 11. The "excessive mandatory overtime policy" has been in place since at least 2013. *Id.* Teasel provides a "Tabulation of Total Hours Worked In Excess of Nine Hours Per Day – 2015." *Id.* at 7. In that table, Teasel lists the days in excess of nine hours that RCAs at the Caro Center worked during specific months in 2015. Specifically, Teasel asserts that there were 15 days that RCAs worked more than 9 hours in January, 24 days in February, 30 days in March, 29 days in April, 31 days in May, and 30 days in June. *Id.* On the days in questions, RCAs worked from between 10.10 hours and 16.98 hours. *Id.* Teasel also includes a similar list for 2016 and 2017. For those years, RCAs worked overtime between 16 and 31 days each month. *Id.* at 8. On those days, the RCAs in question worked between 9.01 and 13.62 hours. *Id.*

The amended complaint includes an anecdote by a former Caro Center RCA, Renae Goyette, explaining how the long hours affected her well-being and ability to safely perform her duties. Goyette was assigned to watch a patient who was prone to hurt herself. *Id.* The patient tried to cover her head with a blanket, and, after Goyette removed the blanket, the patient attacked Goyette. *Id.* at 9. Teasel alleges that "[f]or RCAs who are being repeatedly mandated to work 16-hour days, for multiple days in a row, it becomes very difficult to stay awake while watching a dangerous patient. This creates a tremendous hazard." *Id.*

Teasel alleges that inadequate care at the Caro Center has resulted in the following dangers: "riots, patient-on-patient and patient-on-staff assaults, suicides and attempts at suicide, self-

maiming and attempts at self-maiming, intoxication from excessive ingestion of water, and attempts to escape and actual escapes from the premises." *Id.* at 16–17. Beyond the risk of violence, Teasel also alleges that the RCA exhaustion impairs treatment: "Many of the patients do not receive visitors, are very solitary, do not engage with one another or the staff, and suffer from severe loneliness. They need one-on-one time with RCAs to heal. Yet, due to excessive overtime, they are not receiving the attention that they need." *Id.* at 18.

**B.**

Teasel further identifies a number of studies, news stories, and expert opinions which support his argument that the mandatory overtime policy adversely impacts patient care, health, and safety. Teasel cites a "recent report of the Michigan Occupational Safety and Health Administration (MIOSHA) of October 18, 2016, [which] found that deteriorating conditions at just one hospital, Caro Center, resulted in the following patient inflicted injuries on staff: "Fractures of the skull and leg[;] Detached retina[;] Torn rotator cuffs[;], Torn biceps tendon[;], Torn labrum (cartilage holds shoulder together)[;] Concussions[;] Ruptured discs[;] Exposure to blood and other potentially infectious materials[;] Hair torn out[;] Soft tissue injuries." *Id.* at 9–10. Teasel admits that the MIOSHA report did not "address the question of mandatory overtime for RCAs." *Id.* at 10. Likewise, the MIOSHA report did not discuss whether any patients have been injured.

Similarly, the Michigan Department of Community Health has established a task force which reviews nursing practices within the state, with particular focus on "mandatory overtime and its impact on patient care, health, and safety." *Id.* at 20. The task force summarized its findings regarding nurse fatigue as follows:

- nurses caring for many high-acuity patients or working repeated long shifts may get inadequate rest and become fatigued. Fatigued nurses make more errors and

> fail to catch the errors of others, compromising the quality and safety of patient care.
>
> - nurses assessing their own human factors may fail to recognize the need to implement fatigue management strategies, engage in self-care efforts, or consider the physical, mental, and emotional variables that impact their ability to be vigilant, make critical decisions, and provide safe patient care
>
> - extended work hours, mandated work shifts, and shifts that start during normal sleep hours (e.g. 3am) have been associated with health care errors, as well as patient and nurse morbidity and mortality.

*Id.* (quoting MDCH Task Force Rep. at 7, ECF No. 30, Ex. D).

The task force report emphasized "the need for sufficient time between nursing work period to manage fatigue, minimize sleep loss, and maximize alertness to provide quality nursing care to patient[s] during the next work day." MCDH Task Force Rep. at 7. The report observed:

> [N]urses may work long hours due to personal choice or employer mandate. Historically, nurses have been exempted from regulations limiting work hours. Michigan statutes and regulations are silent on the number of hours per day or per week that nurses may work in direct patient care, and most bedside nurses have become accustomed to working long hours and sleeping little.

*Id.*

Among other suggestions, the report recommended that nurses should "support a workplace culture change the eliminates extended work periods, i.e. mandatory overtime or excessive voluntary overtime, greater-than-8-hour shifts, double shifts, and 72-96 hour work weeks." *Id.* at 8. Ultimately, the report concluded that "[p]atients and their families will benefit from reduced nursing fatigue, improved care and patient outcomes provided by nurses who are safe, well-rested, alert and vigilant to respond to changes in patient condition, detect errors, as well as intercept/prevent errors in patient treatment and medication, and physically and mentally able to provide safe, high-quality patient care." *Id.* at 12.

Teasel also references an opinion proffered by Dr. Timothy Roehrs, the "Director of Research at the Sleep Disorders and Research Center at Henry Ford Health System and a professor in the Wayne State University School of Medicine Department of Psychiatry and Behavioral Neurosciences." *Id.* at 11. In Dr. Roehrs's report, he summarizes the "behavior/functional consequence[s] of insufficient sleep" and states his "expert opinion that requiring RCAs to work mandatory overtime shifts as is currently being scheduled poses a direct danger to their own health and most importantly to the health and safety of patients." *Id.* at 12 (quoting Dr. Roehrs Rep. at 5, ECF No. 30, Ex. I).

In further support of his contention that mandatory overtime has created dangerous conditions for Caro Center patients, Teasel references a number of news articles from around the country which document the exhaustion caused by mandatory overtime practices. *Id.* at 12–13.

In short, Teasel alleges that his substantive due process rights have been violated because a number of patients have "injured themselves and others due to the failure of staff suffering from excessive fatigue." Am. Compl. at 21. Thus, "[t]he mandatory overtime practices of the Defendant poses [sic] a clear and present danger to the health and safety of patients in Defendant's hospitals." *Id.*

## II.

### A.

Laskowski has moved to dismiss Teasel's complaint for lack of standing. Rule 12(b)(1) provides the means by which a party may assert lack of subject-matter jurisdiction as a defense. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*,

15 F.3d 592, 598 (6th Cir.1994)). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* However, a "factual attack challenges the factual existence of subject matter jurisdiction." *Id.* In that case, "the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015). Regardless, "the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

A court faced with a Rule 12(b)(6) or Rule 12(b)(1) motion must typically limit its consideration to the pleadings or convert it to a motion for summary judgment under Federal Rule of Civil Procedure 12(d). *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 487 (6th Cir. 2009). However, when a "jurisdictional prerequisite" is in question, "a district court may admit extrinsic evidence and resolve disputed facts to decide if the asserted claim satisfies the jurisdictional prerequisite." *Id.* at 481.

### III.

In the motion to dismiss, Laskowski challenges Teasel's standing to bring suit. Article III, § 2 of the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." The doctrine derived from Art. III, § 2 imposes the requirement of standing: federal jurisdiction exists only if the dispute is one "which [is] appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). For standing to exist, three elements must be satisfied: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61(1992). Injury in fact exists when the plaintiff has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," not "conjectural or

hypothetical." *Id.* at 560 (citations omitted). Causation exists if the injury is one "that fairly can be traced to the challenged action of the defendant." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976). The redressability requirement is satisfied if the plaintiff's injury is "likely to be redressed by a favorable decision." *Id.* at 38.

Laskowski argues that Teasel has not adequately alleged a concrete and particularized injury. Laskowski further argues that any injury alleged is not fairly traceable to the mandatory overtime policy.

**A.**

Laskowski's challenge to Teasel's standing is primarily focused on the fact that Teasel is a patient at the Caro Center, not one of the RCAs. Laskowski disputes the validity of Teasel's factual allegations regarding mandatory overtime, but appears to concede that, if brought by an RCA plaintiff, Teasel's complaint would suffice to allege a concrete and particularized injury to the RCAs being forced to work overtime.[1] Laskowski argues that Teasel's alleged injuries are inadequate because they are "based primarily on speculation, and the premise that anything with which Plaintiff disagrees, or any injury to anyone at the facility, must be assumed to be the result of mandatory overtime by RCAs." Def. Mot. Dismiss at 9, ECF No. 43. Laskowski continues: "The false logic in Plaintiff's argument is illustrated by his allegation that any time a violent patient strikes/injures a staff member, one must assume that the patient was injured, and that the event was due to a tired RCA working mandatory overtime." *Id.* at 12.

Teasel frames his alleged injuries as follows:

---

[1] Laskowski takes care to point out that the Caro Center and the RCAs negotiated a CBA which expressly provided for mandatory overtime. To the extent the RCAs might attempt to bring suit challenging the mandatory overtime, it is possible that the suit would be preempted by the Labor Management Relations Act. *See DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994). Any injury which the mandatory overtime policy inflicts on RCAs but not patients is, of course, insufficient to establish standing for Teasel to bring this suit.

Plaintiff's Amended Complaint alleges that Plaintiff:

1. Has been exposed to violence which has threatened to cause Plaintiff substantial harm and has interfered with his treatment;

2. Has been overmedicated due to perceived aggression that does not exist and is threatened with overmedication;

3. Has become sick as a result of illnesses brought into Caro Center and is threatened with illness;

4. Has had his treatment interfered with and has been denied opportunities at socialization which are part of his rehabilitation care plan and has been threatened with the loss of activities needed for rehabilitation.

Pl. Resp. Br. at 3, ECF No. 52.

Although the injuries that Teasel alleges are—by definition—difficult to quantify, they are sufficiently specific and concrete to satisfy standing requirements. For standing to exist, the plaintiff must allege "an injury in fact" that is "both concrete *and* particularized." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). To be particularized, "the injury must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. "A 'concrete' injury must be 'de facto'; that is, it must actually exist." *Spokeo*, 136 S. Ct. at 1548. "'Concrete' is not, however, necessarily synonymous with 'tangible.'" *Id.* at 1549. Intangible injuries can be sufficiently concrete to establish standing.

The Supreme Court has recognized that involuntarily committed psychiatric patients have a constitutional right to "safe conditions." *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982). Likewise, "[w]hen a person is institutionalized—and wholly dependent on the State— . . . a duty to provide certain services and care does exist, although even then a State necessarily has considerable discretion in determining the nature and scope of its responsibilities. *Id.* at 317. Thus, if Teasel is not receiving "minimally adequate care and treatment," his constitutional rights have been infringed. *Id.* at 319.

Teasel's complaint alleges that RCA fatigue has resulted in inadequate supervision of patients, thus increasing the risk of patient-on-patient and patient-on-staff violence. He further alleges that the RCA fatigue has resulted in a lower standard of healthcare for him (and his fellow patients), including risk of overmedication[2] and insufficient socialization. Thus, Teasel contends that he is not receiving the minimally adequate care and treatment that the Constitution requires. Laskowski argues that Teasel has not alleged any instances where he was personally subjected to violence or overmedication because of RCA fatigue. But Teasel has alleged that RCA fatigue has increased the risk of violence and/or overmedication to a constitutionally inadequate level. Assuming that to be true, Teasel should not be required to wait until he actually suffers injury. *See Helling v. McKinney*, 509 U.S. 25, 34 (1993) ("[A] prisoner need not wait until he is actually assaulted before obtaining relief. . . . We thus reject petitioners' central thesis that only deliberate indifference to current serious health problems of inmates is actionable under the Eighth Amendment."). Rather, an increased risk of future harm can, if severe enough, constitute actual injury for purposes of standing. *See id.* at 34–35.

The line between poor but adequate and constitutionally insufficient care is not well-defined. In *Youngberg*, the Supreme Court held that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests" and further stated that "[i]n determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness." *Id.* at 321, 324. But at this stage, Teasel is not required to prove that his constitutional

---

[2] In response, Laskowski argues that RCAs do not make medication decisions and thus could not be responsible for any overmedication that occurs. But this response misconstrues Teasel's argument. He asserts that inattention by RCAs results in increased aggression and violence by unattended patients. Because those patients thus appear more aggressive than they would if they received adequate attention, they are more medicated than they otherwise would be. Teasel may not ultimately prevail in proving that overmedication is occurring, but he has sufficiently alleged its existence and a purported link to the RCAs for purposes of establishing standing at the motion to dismiss stage.

rights have in fact been violated. He is simply required to allege, via well-pleaded factual allegations, that a legally protected interest of his has been invaded. *Lujan*, 504 U.S. at 561. The amended complaint suffices to meet that standard.

**B.**

The closer question is whether Teasel's allegation of inadequate care and treatment can be fairly traced to the Director's mandatory overtime policy. If the overtime policy is not impacting Teasel's level of care and treatment, then he has not satisfied the traceability requirement of standing. Laskowski repeatedly argues that this is the case. *See* Mot. Dismiss at 6 ("Curiously, Plaintiff does not seek an injunction banning voluntary overtime. Apparently, Plaintiff asserts that mandating overtime leads to tired incapable employees, but voluntary overtime has no adverse effect."); *id.* at 8 ("Plaintiff cites to a number of documents to create a mirage, arguing that such items illustrate that 'mandatory' overtime at the Caro Center is the genesis of all outbursts, illnesses, sadness or other problems."); *id.* at 9 (Plaintiff's affidavit is "based primarily on speculation, and the premise that anything with which Plaintiff disagrees, or any injury to anyone at the facility, must be assumed to be the result of mandatory overtime by RCAs."); *id.* at 11 ("[T]here is no logical nexus between the asserted harm and the activity of the RCA, or any effort to identify the RCA involved, and nothing to show that mandatory overtime was at issue or related to the alleged event."); *id.* at 12 ("The false logic in Plaintiff's argument is illustrated by his allegation that any time a violent patient strikes/injures a staff member, one must assume that the patient was injured, and that the event was due to a tired RCA working mandatory overtime.").

In response, Teasel relies on a number of documents he presented with his amended complaint.[3] First, Teasel submitted an affidavit along with (and cited in) the amended complaint.

---

[3] Normally, a Court may not consider extrinsic evidence when resolving a Rule 12(b) motion to dismiss. Here, however, only documents extensively relied upon in (and attached to) the amended complaint will be considered.

*See* Teasel Aff., ECF No. 30, Ex. A. In his affidavit, Teasel asserts that "[s]ince the excessive overtime hours began, resident care aides seem to be getting ill more often because they are worn down. This has had a serious impact on patient health." *Id.* at 1. Teasel further alleges that "[s]ince the mandatory excessive overtime began, resident care aides are often angry with patients and are unwilling to help us because they are so tired." *Id.* at 2. Likewise, Teasel contends that RCA fatigue is increasing RCA irritability, which makes the RCAs "more likely to write someone up if there is a confrontation with a patient, instead of dealing with the situation in a more traditional manner." *Id.* at 3. Because writes-ups may result in increased medication or a longer stay at the Caro Center for patients, the RCAs' "lack of sleep is leading to overmedication of patients and, worse, longer stays." *Id.* Finally, Teasel asserts that "[a]lmost every day, I see staff asleep in their chairs. The staff will only wake up when there is a loud noise made near them. . . . I have heard of and witnessed multiple incidents of patient violence caused by or escalated by this situation." *Id.* at 3.

The amended complaint also relies upon a report written by Dr. Roehrs, whom Teasel advances as an expert on the impact of sleep deprivation on the body and mind. Dr. Roehrs reviewed the affidavits, records, and pleadings in this matter and concluded that "requiring RCAs to work mandatory overtime shifts as is currently being scheduled poses a *direct danger* to their own health and most importantly to the *health and safety of patients*." Am. Compl. at 12 (quoting Dr. Roehrs Rep. at 5, ECF No. 30, Ex. I) (emphasis added).

Likewise, Teasel relies upon the 2012 report prepared by a Task Force on Nursing Practice created by the Michigan Department of Community Health, summarized on pages four and five of this opinion. Am. Compl. at 20 (citing MDCH Task Force Rep., ECF No. 30, Ex. D). The task

---

These documents are considered part of the pleadings. *See Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997). More importantly, the Court is permitted to rely upon extrinsic evidence when, as here, a threshold jurisdictional challenge is made. *See Tackett*, 561 F.3d at 481.

force report was not focused on the Caro Center, but made general findings that "[f]atigued nurses make more errors and fail to catch the errors of others," and further asserted that "extended work hours, mandated work shifts, and shifts that start during normal sleep hours (e.g. 3am) have been associated with health care errors, as well as patient and nurse morbidity and mortality." MDCH Task Force Rep. at 7. In conclusion, the report opined that "[p]atients and their families will benefit from reduced nursing fatigue, improved care and patient outcomes provided by nurses who are safe, well-rested, alert and vigilant to respond to changes in patient condition, detect errors, as well as intercept/prevent errors in patient treatment and medication, and physically and mentally able to provide safe, high-quality patient care." *Id.* at 12.

And, finally, Teasel proffers an affidavit from a former Caro Center RCA who explained that the mandatory overtime deprived her of sleep and created anxiety that she would be unable to react quickly enough to prevent patients from harming each other. *See* Goyette Aff. at 6, ECF No. 30, Ex. B. Goyette specifically stated that the "grueling schedule . . . impacted [her] job performance." *Id.* at 2. In particular, Goyette "feared that the patient I was supposed to be watching could be attacked, or try to attack me or another staff member. I feared falling asleep and giving the one-to-one patients an opening to attack or escape." *Id.* at 6.

Thus, Teasel has provided a significant amount of non-speculative evidence which identifies a connection between caregiver fatigue and patient well-being. Teasel purports to have observed a decrease in patient care and treatment since the institution of the mandatory overtime policy. A doctor and professor who specializes in study of sleep deprivation has opined that the Caro Center's policy poses a direct danger to the well-being of the patients. A report by a task force affiliated with the State of Michigan has emphasized the impact of nurse fatigue on patient

- 13 -

well-being, including morbidity and mortality. And, finally, an RCA from the Caro Center has opined that the mandatory overtime policy impaired her ability to protect patients from violence.

The evidence proffered by Teasel is insufficient, at this stage, to affirmatively establish that the mandatory overtime policy is resulting in patient care below the constitutional standard established in *Youngberg*. But such a showing is not required to demonstrate standing. In *Wuliger v. Manufacturers Life Ins. Co.*, the Sixth Circuit explicated the kind of "causation" which plaintiffs must allege to establish traceability:

> [T]he causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the plaintiff need only allege 'injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'

567 F.3d 787, 796 (6th Cir. 2009) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). "Proximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1394 (2014). Thus, the traceability analysis does not focus on whether the plaintiff has alleged facts sufficient to show that the defendant's conduct caused the plaintiff's injury for purposes of liability. Here, Teasel has provided sufficient non-speculative allegations that the mandatory overtime policy is harming patients to establish standing at the pleading stage. Laskowski's motion to dismiss will be denied.

**IV.**

Because it may inform the arguments made by the parties at the upcoming hearing, several issues raised by Teasel's motion for a preliminary injunction will be briefly outlined. Four factors govern whether the Court will issue a preliminary injunction: (1) whether the plaintiff has demonstrated a substantial likelihood of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would harm others; and (4)

whether the public interest is served by granting injunctive relief. *Hamilton's Bogarts, Inc.*, 501 F.3d at 649. Importantly, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008). As such, a preliminary injunction should be issued only "if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In fact, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, (1981).

### A.

As discussed above, Teasel predicates his claim for relief on his substantive due process right to safe conditions and minimally adequate care and treatment. *See Youngberg*, 457 U.S. 324 ("We repeat that the State concedes a duty to provide adequate food, shelter, clothing, and medical care. These are the essentials of the care that the State must provide. The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution."). In determining whether that right has been violated, courts must balance the claimant's "liberty interests against the relevant state interests." *Id.* at 321. Likewise, "[i]n determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness." *Id.* at 324. The importance of deference to judgments made by healthcare professional has been emphasized by the Supreme Court: "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the

person responsible actually did not base the decision on such a judgment." *Id.* at 323. "By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized." *Id.* at 322.

**B.**

Teasel argues that he has demonstrated a strong likelihood of success on the merits because "there can be no legitimate dispute over whether the government action of overworking RCAs to the point of exhaustion is action taken to protect the patients. As for any protective effect, it is beyond dispute that patients are not as safe when there are fewer and more fatigued RCAs monitoring them." Mot. Prelim. Inj. at 13.

At the hearing on January 22, 2018, Teasel should focus his argument and evidence on several points. First, Teasel should explain specifically what the minimal constitutional requirements in this context are and, relatedly, why the level of care at the Caro Center falls below those minimal requirements. Second, Teasel should articulate why that deficient level of care can be directly traced to mandatory overtime, as opposed to any other factor. Third, Teasel should address whether the use of mandatory overtime is a generally accepted practice within the healthcare industry. *See Youngberg*, 457 U.S. at 323. Third, Teasel should focus his proofs on the assertion that the rate of suicide, patient injury, and illness has increased in recent years at the Caro Center and, further, identify the evidence that any such increase is attributable to the mandatory overtime policy. Finally, Teasel should explain whether the hiring of 13 RCAs by the Caro Center in October has adequately addressed his request for preliminary injunctive relief and if not, why not.

Laskowski should address, first, the relevance of *Helling v. McKinney* to Teasel's motion for preliminary injunctive relief. 509 U.S. 25, 35 (1993). Second, Laskowski should address

whether the MDCH Task Force Report, Dr. Roehrs' testimony, and the fact that numerous states now prohibit mandatory overtime establishes that use of mandatory overtime constitutes a "substantial departure from accepted professional judgment, practice, or standards." *Youngberg*, 457 U.S. at 323. Third, Laskowski should respond to Teasel's contention that patient-on-patient and patient-on-staff violence at the Caro Center is common and, further, that more RCAs and less overtime could prevent that violence.

**V.**

Accordingly, it is **ORDERED** that Defendant Laskowksi's motion to dismiss, ECF No. 43, is **DENIED.**

Dated: December 15, 2017       s/Thomas L. Ludington
                                THOMAS L. LUDINGTON
                                United States District Judge

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 15, 2017.

                    s/Kelly Winslow
                    KELLY WINSLOW, Case Manager

---